Leah A. Martin, Esq.
Nevada Bar No. 7982
Kevin Hejmanowski, Esq.
Nevada Bar No. 10612
LEAH MARTIN LAW
601 South Rancho Drive, Suite C-26
Las Vegas, Nevada 89106
Telephone: (702) 420-2733
Facsimile: (702) 330-3235
lmartin@leahmartinlv.com
khejmanowski@leahmartinlv.com

*Counsel for Defendants and Counterclaimants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DEVOLVER DIGITAL, INC., )<br><br>            Plaintiff(s),            )<br><br>v.                                    )<br><br>ESC-TOY, LTD., et al.,        )<br><br>            Defendant(s).       )<br> ) ) ) ) ) | Case No.: 2:26-cv-01534-APG-BNW<br><br>**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND DEMAND FOR JURY TRIAL** |

Defendants ESC-Toy, Ltd. ("ESC") and Erick Chatel ("Chatel"), individually and doing business as Erick Scarecrow (collectively, "Defendants"), by and through their undersigned attorneys, LEAH MARTIN, ESQ. and KEVIN HEJMANOWSKI, ESQ., of the law firm of LEAH MARTIN LAW, hereby answers the Complaint of Plaintiff Devolver Digital, Inc. ("Plaintiff") as follows:

1. Defendants deny the allegations in Paragraph 1 of the Complaint. Defendants deny that their activities constitute "unauthorized and extensive exploitation" of any intellectual property. The Fulfillment and Collaboration Agreement ("Agreement") grants ESC perpetual survivorship rights under Section 9, as confirmed by Judge Pitman's Transfer Order (Dkt. 18). Defendants further deny that they have deceived consumers or falsely suggested an

affiliation with Devolver that does not exist; Defendants' products are Collaboration Products authorized by the Agreement.

2. Paragraph 2 contains characterizations and legal conclusions to which no response is required. To the extent a response is required, Defendants deny that Devolver's "core values" are "threatened" by Defendants' authorized activities.

3. In response to paragraph 3, Defendants admit that Devolver claims to be an exclusive licensee of certain Hotline Miami copyrights and trademarks. Defendants deny that Devolver is the owner of such copyrights, as the Hotline Miami IP is owned by Dennaton Games (Dennis Wedin), not Devolver. Judge Pitman noted that Wedin is "the actual Hotline Miami IP owner." (Dkt. 18 at 9.) Defendants deny that they have infringed or are continuing to infringe any valid intellectual property right of Devolver.

4. The agreement referred to in paragraph 4 speaks for itself.  To the extent the allegations conflict with the terms of the agreement, they are denied.

5. The allegations of paragraph 5 state legal conclusions to which no response is required.  To the extent a response is required, the allegations of paragraph 5 are denied.

6. The allegations of paragraph 6 state legal conclusions to which no response is required.  To the extent a response is required, the allegations of paragraph 6 are denied.

7. The allegations of paragraph 7 state legal conclusions to which no response is required.  To the extent a response is required, the allegations of paragraph 7 are denied.

8. The allegations of paragraph 8 state legal conclusions to which no response is required.  To the extent a response is required, the allegations of paragraph 8 are denied.

9. The allegations of paragraph 9 state legal conclusions to which no response is required. To the extent a response is required, the allegations of paragraph 9 are denied.

10. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 10 of the Complaint and therefore deny the same.

11. Responding to paragraph 11, Defendants admit that ESC-Toy Ltd. Is a New York Company with its principal place of business in Nevada. All remaining and inconsistent allegations contained in paragraph 11 are denied.

12. Responding to paragraph 12, Defendants admit that Erick Chatel utilizes the pseudonym Erick Scarecrow, that he resides in Nevada, that he founded ESC-Toy in 2005, and that he is involved in every aspect of the company. All remaining and inconsistent allegations contained in paragraph 12 are denied.

13. Paragraph 13 contains no factual allegations for which response is required. To the extent a response is required, Defendants deny the same.

14. Defendants admit the allegations contained in paragraph 14.

15. Defendants deny the allegations contained in paragraph 15.

16. Defendants deny the allegations contained in paragraph 16.

17. Defendants deny the allegations contained in paragraph 17.

18. Defendants deny the allegations contained in paragraph 18.

19. Defendants deny the allegations contained in paragraph 19.

20. Defendants deny the allegations contained in paragraph 20.

21. Defendants deny the allegations contained in paragraph 21.

22. Defendants deny the allegations contained in paragraph 22.

23. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 23 of the Complaint and therefore deny the same.

24. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 24 of the Complaint and therefore deny the same.

25. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 25 of the Complaint and therefore deny the same.

26. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 26 of the Complaint and therefore deny the same.

27. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 27 of the Complaint and therefore deny the same.

28. Paragraph 28 contains no factual allegations for which response is required. To the extent a response is required, Defendants deny the same.

29. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 29 of the Complaint and therefore deny the same.

30. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 30 of the Complaint and therefore deny the same.

31. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 31 of the Complaint and therefore deny the same.

32. Defendants admit the allegations contained in paragraph 32.

33. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 33 of the Complaint and therefore deny the same.

34. The agreement referred to in paragraph 34 speaks for itself.  To the extent the allegations conflict with the terms of the agreement, they are denied.

35. The agreement referred to in paragraph 35 speaks for itself.  To the extent the allegations conflict with the terms of the agreement, they are denied.

36. The agreement referred to in paragraph 36 speaks for itself.  To the extent the allegations conflict with the terms of the agreement, they are denied.

37. The agreement referred to in paragraph 37 speaks for itself.  To the extent the allegations conflict with the terms of the agreement, they are denied.

38. Defendants admit the allegations contained in paragraph 38.

39. Defendants admit that the Agreement was terminated in 2019.  All remaining or inconsistent allegations contained in paragraph 39 are denied.

40. Defendants deny the allegations contained in paragraph 40.

41. Defendants deny the allegations contained in paragraph 41.

42. Defendants deny the allegations contained in paragraph 42.

43. Defendants deny the allegations contained in paragraph 43.

44. Defendants deny the allegations contained in paragraph 44.

45. Responding to paragraph 45, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

46. Responding to paragraph 46, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

47. Responding to paragraph 47, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

48. Responding to paragraph 48, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

49. Responding to paragraph 49, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

50. Responding to paragraph 50, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

51. Responding to paragraph 51, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

52. Responding to paragraph 52, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

53. Responding to paragraph 53, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

54. Responding to paragraph 54, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

55. Responding to paragraph 55, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

56. Responding to paragraph 56, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

57. Defendants admit the allegations contained in paragraph 57.

58. Defendants deny the allegations contained in paragraph 58.

59. Responding to paragraph 59, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

60. Responding to paragraph 60, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

61. Responding to paragraph 61, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

62. Responding to paragraph 62, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

63. Responding to paragraph 63, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

64. Responding to paragraph 64, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

65. Responding to paragraph 65, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

66. Responding to paragraph 66, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

67. Responding to paragraph 67, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

68. Responding to paragraph 68, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

69. Responding to paragraph 69, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

70. Responding to paragraph 60, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

71. Responding to paragraph 71, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

72. Responding to paragraph 72, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

73. Responding to paragraph 73, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

74. Defendants deny the allegations contained in paragraph 74.

75. Responding to paragraph 75, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

76. Responding to paragraph 76, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

77. Defendants deny the allegations contained in paragraph 77.

78. Defendants deny the allegations contained in paragraph 78.

79. Defendants deny the allegations contained in paragraph 79.

80. Defendants deny the allegations contained in paragraph 80.

81. Defendants deny the allegations contained in paragraph 81.

82. Defendants deny the allegations contained in paragraph 82.

83. Defendants deny the allegations contained in paragraph 83.

84. Defendants deny the allegations contained in paragraph 84.

85. Responding to paragraph 85, Defendants state that the post speaks for itself. All remaining and inconsistent allegations are denied.

86. Defendants deny the allegations contained in paragraph 86.

87. Defendants deny the allegations contained in paragraph 87.

88. Defendants deny the allegations contained in paragraph 88.

### FIRST CAUSE OF ACTION

### Trademark Infringement Under 15 U.S.C. 1114

89. Paragraph 89 contains no factual allegations for which response is required.

90. Responding to paragraph 90, the trademark registrations speak for themselves. Any remaining and inconsistent allegations are denied.

91. Defendants deny the allegations contained in paragraph 91.

92. Defendants deny the allegations contained in paragraph 92.

93. Defendants deny the allegations contained in paragraph 93.

94. Defendants deny the allegations contained in paragraph 94.

95. Defendants deny the allegations contained in paragraph 95.

96. Defendants deny the allegations contained in paragraph 96.

97. Defendants deny the allegations contained in paragraph 97.

98. Defendants deny the allegations contained in paragraph 98.

**SECOND CAUSE OF ACTION**

**False Designation of Origin / Unfair Competition Under 15 U.S.C. 1125(a)**

99. Paragraph 99 contains no factual allegations for which response is required.

100. Defendants deny the allegations contained in paragraph 100.

101. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 101 of the Complaint and therefore deny the same.

102. Defendants deny the allegations contained in paragraph 102.

103. Defendants deny the allegations contained in paragraph 103.

104. Defendants deny the allegations contained in paragraph 104.

105. Defendants deny the allegations contained in paragraph 105.

106. Defendants deny the allegations contained in paragraph 106.

107. Defendants deny the allegations contained in paragraph 107.

108. Defendants deny the allegations contained in paragraph 108.

## THIRD CAUSE OF ACTION

### Copyright Infringement Under 17 U.S.C. 101

109. Paragraph 109 contains no factual allegations for which response is required.

110. Defendants deny the allegations contained in paragraph 100.

111. Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in paragraph 111 of the Complaint and therefore deny the same.

112. Defendants deny the allegations contained in paragraph 112.

113. Defendants deny the allegations contained in paragraph 113.

114. Defendants deny the allegations contained in paragraph 114.

115. Defendants deny the allegations contained in paragraph 115.

### <u>AFFIRMATIVE DEFENSES</u>

Without assuming the burden of proof on any issue for which Devolver bears the burden, Defendants assert the following Affirmative Defenses:

**FIRST DEFENSE — License and Authorization.** Defendants' activities are licensed and authorized under the Agreement, including but not limited to Section 9's perpetual survivorship right, as confirmed by Judge Pitman's Transfer Order (Dkt. 18).

**SECOND DEFENSE — Copyright Ownership.** Defendants own valid, registered copyrights in their original creative contributions to the Collaboration Products, with registrations dating from October 2019. Devolver's own authorized counsel acknowledged ESC's copyrightable contributions in the Sexton Letter.

**THIRD DEFENSE — Independent Creation.** Defendants' works, including character variants, original character designs, stories, sculptural designs, and packaging art, are independently created works of authorship not derived from or copying Devolver's underlying IP.

**FOURTH DEFENSE — Nominative Fair Use.** Defendants' use of the DEVOLVER DIGITAL and HOTLINE MIAMI marks constitutes nominative fair use to truthfully identify the collaborative nature of the products.

**FIFTH DEFENSE — Estoppel.** Devolver is estopped from asserting the claims in the Complaint by reason of its prior admissions through authorized counsel (the Sexton Letter), its conduct-based admissions (the $85,000 purchase attempt), and its 18-month silence following ESC's January 2023 good faith notice.

**SIXTH DEFENSE — Unclean Hands.** Devolver's claims are barred by the doctrine of unclean hands. Devolver filed knowingly false DMCA takedown notices, omitted material exculpatory evidence from the Complaint, filed suit in the wrong venue, and took irreconcilable litigation positions, as detailed in Defendants' Counterclaims.

**SEVENTH DEFENSE — Waiver.** Devolver waived any claims against Defendants by acknowledging ESC's rights through the Sexton Letter and failing to respond to ESC's January 2023 notice for eighteen months.

**EIGHTH DEFENSE — Laches.** Devolver's claims are barred by laches. Devolver was aware of Defendants' activities since at least June 2019 (the Sexton Letter) and took no enforcement action until February 2026—a delay of nearly seven years during which ESC invested substantial resources in developing its creative portfolio.

**NINTH DEFENSE — Section 19 Indemnification Offset.** Under Section 19 of the Agreement, Devolver is obligated to indemnify ESC against any claims arising from Devolver's breach of the Section 18 warranties, including reasonable outside attorneys' fees. Any award to Devolver is subject to offset by ESC's indemnification claim.

**TENTH DEFENSE — 17 U.S.C. § 412 Registration Bar.** Under 17 U.S.C. § 412, Devolver cannot recover statutory damages or attorney's fees for any alleged infringement that commenced before Devolver's December 2025 copyright registrations. ESC's registrations predate Devolver's by over six years.

**ELEVENTH DEFENSE — First Sale Doctrine.** To the extent Devolver's claims relate to the resale of previously authorized Collaboration Products, such claims are barred by the first sale doctrine under 17 U.S.C. § 109(a).

**TWELFTH DEFENSE — Copyright Misuse.** Devolver's copyright claims are barred by the doctrine of copyright misuse. Devolver has used its claimed copyrights to suppress competition and destroy ESC's business through false DMCA takedowns, rather

than to protect legitimate creative interests, and in direct violation of Devolver's Section 5 obligation to market Collaboration Products in good faith.

**THIRTEENTH DEFENSE — Failure to Mitigate.** Devolver failed to mitigate its alleged damages by refusing to accept the royalties ESC offered in January 2023, refusing to negotiate in good faith, and instead pursuing a retaliatory litigation and DMCA campaign that increased rather than reduced any alleged harm. Devolver's campaign destroyed rather than preserved value, including ESC's prospective PM Studios publishing relationship.

**FOURTEENTH DEFENSE — Failure to State a Claim.** The Complaint fails to state a claim upon which relief can be granted as to each cause of action.

**FIFTEENTH DEFENSE — Absence of Likelihood of Confusion.** Devolver's trademark registrations cover computer game software and online retail services (Classes 009 and 035), not collectible merchandise, figures, pins, plush toys, or sculptural works. Defendants' products operate in a different class of goods and are not likely to cause consumer confusion with Devolver's registered goods and services.

**SIXTEENTH DEFENSE — Setoff for Devolver's Own Infringement.** Devolver's claims are barred or subject to setoff by reason of Devolver's own infringement of Defendants' registered copyrights, including five specific works identified in ESC's January 31, 2023 notice, which Devolver never disputed or responded to for eighteen months.

**SEVENTEENTH DEFENSE — Reservation of Defenses.** Defendants reserve the right to assert additional affirmative defenses as discovery progresses and additional facts become known. Defendants further reserve the right to amend the Counterclaims to identify

and add Does 1 through 100, including any persons or entities who directed, authorized, or ratified Devolver's wrongful conduct.

## COUNTERCLAIMS

### PRELIMINARY STATEMENT

1. Defendants/Counterclaim Plaintiffs ESC-Toy, Ltd. ("ESC") and Erick Chatel ("Chatel"), individually and doing business as Erick Scarecrow (collectively, "Counterclaim Plaintiffs"), assert the following Counterclaims against Plaintiff/Counterclaim Defendant Devolver Digital, Inc. ("Devolver").

2. On May 14, 2026, Judge Robert Pitman of the Western District of Texas granted ESC's Motion to Transfer and issued findings that expose the fundamental dishonesty of Devolver's litigation position. Judge Pitman found that the Fulfillment and Collaboration Agreement between the parties *remains valid and enforceable*, that the forum selection clause *survived termination*, and that Devolver's "entire… relation with the [*Hotline Miami*] IP stems from the Agreement." (Dkt. 18 at 7.) On the same day, Judge Edward M. Chen of the Northern District of California denied sanctions against ESC in a related case, found that ESC "is thus not precluded from asserting its breach of contract claim," and recognized ESC as a "sophisticated industry player" with independent creative contributions. (*ESC-Toy, Ltd. v. Sony Interactive Entertainment LLC*, Case No. 3:21-cv-00778-EMC, Dkt. 529 at 2, 35.)

3. These findings demolish the premise of Devolver's Complaint. Devolver sued ESC claiming the Agreement was terminated and ESC possesses no surviving rights. Two federal judges have now said otherwise. What remains is the truth: Devolver exploited ESC's creative talent across more than ten gaming franchises, acknowledged ESC's rights

through its own authorized counsel, attempted to purchase those rights for approximately $200,000, and—when ESC refused to sell—launched a retaliatory campaign of litigation, DMCA takedowns, and business interference designed to destroy the very business it helped create.

## PARTIES

**4.** Counterclaim Plaintiff ESC-Toy, Ltd. is a Nevada corporation with its principal place of business in Las Vegas, Nevada.

**5.** Counterclaim Plaintiff Erick Chatel, known professionally as "Erick Scarecrow," is an individual residing in Las Vegas, Nevada. Chatel is the founder, owner, and President of ESC.

**6.** Counterclaim Defendant Devolver Digital, Inc. is a corporation organized under the laws of Texas with its principal place of business in Austin, Texas. Devolver is a video game publisher that holds a publishing license for the *Hotline Miami* franchise from Dennaton Games.

## JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. These Counterclaims are compulsory under Fed. R. Civ. P. 13(a) because they arise from the same transaction or occurrence as Devolver's Complaint.

**8.** Venue is proper in this District pursuant to Judge Pitman's Transfer Order (Dkt. 18), which enforced the mandatory forum selection clause in Section 24 of the Agreement designating Clark County, Nevada as the exclusive forum.

## FACTUAL ALLEGATIONS

***A. ESC's Industry Presence and Devolver's Pursuit of ESC***

**9.** Before any Agreement existed between the parties, ESC and its founder Erick Scarecrow had established a recognized presence in the gaming and collectibles industries. As Judge Chen found in *ESC-Toy, Ltd. v. Sony Interactive Entertainment LLC*, Case No. 3:21-cv-00778-EMC, "by the time Ms. Gayner became involved with ESC in 2017, ESC was a **sophisticated industry player** independently familiar with video game licensing practices." (Dkt. 529 at 19.) Judge Chen further noted that "ESC had been doing business directly with SIE since 2009, first under a consulting agreement and later under multiple MLAs, with the licensing portfolio between the two companies expanding over time to encompass sixteen SIE titles." (*Id.*) The Court recognized that Chatel "negotiated and performed under the consulting agreement and two separate MLA agreements, participated in agreements with SIE across numerous projects, worked with SIE's licensing and marketing staff on individual titles, and observed SIE's behavior as a counterparty to numerous commercial deals." (Dkt. 529 at 20.)

**10.** Prior to the Devolver collaboration, Chatel and ESC had received multiple industry awards between 2005 and 2013, including Brand of the Year and Artist of the Year, establishing ESC as a recognized creative force in the collectibles and gaming communities. It was this industry reputation—a proven track record of creating successful merchandise programs for major gaming companies—that led Devolver to approach ESC in or about February 2014 to collaborate on collectible figures and merchandise based on the *Hotline Miami* video game franchise. Devolver sought out ESC's creative talent specifically because of Chatel's demonstrated ability to design, produce, and market high-quality collectibles that drive consumer engagement and brand loyalty. ESC did not approach

Devolver asking for a license. Devolver came to ESC because it recognized what Judge Chen would later confirm: ESC is a sophisticated creative force in the gaming industry.

11. In or about August 2014—approximately eight months before the Fulfillment and Collaboration Agreement was executed—ESC launched a Kickstarter campaign for the "HOTLINE MIAMI JACKET FIGURE by Erick Scarecrow." The Kickstarter page attributed the project to three parties equally: "Dennaton, Devolver Digital and esctoy.com." This three-party attribution reflects the reality of the collaboration: ESC was a creative partner, not a manufacturer. Additional Kickstarter campaigns followed for a Biker Figure and a Swan Twins action figure set, each credited to the same three-party collaboration. Attached as

12. No written assignment of intellectual property exists for works Chatel created during this pre-Agreement period. Under 17 U.S.C. § 204(a), transfer of copyright ownership requires a written instrument signed by the owner. The Agreement, executed on April 30, 2015, cannot retroactively assign copyrights in works already created before it was signed. Chatel's pre-Agreement creative contributions—including creative assets developed for the Kickstarter campaigns—are owned by Chatel outright, not as derivatives, not as work-for-hire, but as original works created before any contractual relationship existed. This fact is fatal to Devolver's claim that "any copyright in the Collaboration Products belongs to Devolver and/or its licensors alone."

### B. The Fulfillment and Collaboration Agreement

13. On or about April 30, 2015, ESC and Devolver entered into a Fulfillment and Collaboration Agreement (the "Agreement"), governed by Nevada law (Section 24). The

Agreement established a framework under which ESC would design, produce, and distribute collectible merchandise based on gaming franchises published by Devolver. Chatel served as lead creative designer for all Collaboration Products.

14. Section 9 of the Agreement grants ESC the "exclusive right to sell the remainder of all Collaboration Products" following termination, with no time limitation. This survivorship right necessarily includes the right to reproduce Collaboration Products, because a sell-off right without reproduction rights would render Section 9 meaningless. Judge Pitman confirmed that the Agreement's provisions survive termination. (Dkt. 18 at 5–7.)

15. The Agreement contains no work-for-hire clause, no IP assignment provision, and no arbitration clause. Schedule 1 of the Agreement establishes a fifty percent (50%) commission on all Collaboration Product sales—reflecting that Collaboration Products are jointly created works in which both parties have a substantial interest. Section 8 requires quarterly reconciliation and remittance of proceeds. Section 24 designates Nevada law as the governing law and Section 26 designates Clark County, Nevada as the exclusive forum for disputes.

### C. ESC's Creative Portfolio Across 10+ Franchises

16. Under the Agreement, Chatel created original character designs, sculptural works, plush designs, pin sets, packaging art, and variant characters for Collaboration Products spanning, but not limited to, the following Devolver-published gaming franchises: *Hotline Miami*, *Enter the Gungeon*, *GRIS*, *My Friend Pedro*, *EITR*, *APE OUT*, *Minit*, *Dropsy*, and additional titles. Each of Chatel's contributions constitutes an independently copyrightable work of authorship.

**17.** Beginning in October 2019, ESC registered over thirty (30) original works with the United States Copyright Office. ESC's registrations predate Devolver's December 2025 registrations by over six years. ESC's character variants—including SOAKED, DUSTED, and MMM—do not appear in any video game and constitute entirely original creative expression.

### D. Devolver's Acknowledgment of ESC's Rights

**18.** On June 26, 2019, David Sexton of Alverson Taylor & Sanders, LLP—Devolver's authorized outside counsel in Nevada—sent a letter to ESC acknowledging: (a) ESC's rights under Section 9 to sell the remainder of Collaboration Products; (b) ESC's copyrightable creative contributions; (c) Devolver's ongoing commission obligations under Section 8; and (d) that Devolver had "no intention of using any of ESC's copyrightable elements of the Collaboration Products" and that "[s]hould this change, my client will be sure to contact your client and negotiate an appropriate license fee." The Sexton Letter constitutes a party-opponent admission under FRE 801(d)(2)(C)–(D).

**19.** The Sexton Letter's license fee commitment is particularly significant. Devolver's own counsel acknowledged that (a) ESC's contributions are copyrightable, (b) Devolver would need ESC's permission to use them, and (c) Devolver would negotiate a license fee before doing so. On information and belief, Devolver subsequently used ESC's copyrightable elements—including creative assets—without contacting ESC and without negotiating any license fee, in direct breach of the commitment Devolver made through its own authorized counsel.

**20.** Prior to the Sexton Letter, Devolver attempted to purchase ESC's rights and inventory for approximately $200,000. ESC declined. This conduct-based admission

confirms that Devolver recognized the existence and value of ESC's rights before attempting to extinguish them through litigation.

**21. The investor motive.** Nigel Lowrie, Devolver's co-founder, disclosed to ESC before the formal May 2019 termination letter that new Devolver investors did not want ESC holding the exclusive contract. This disclosure reveals the true motive for Devolver's subsequent campaign: not ESC's conduct, but investor pressure to extinguish a perpetual contract that gave ESC rights the investors viewed as an obstacle. The termination was not a response to any wrongdoing by ESC—it was a corporate decision to eliminate a contractual obligation that new investors found inconvenient.

**22. The failed buyout attempt.** During the termination transition in April–May 2019, the parties negotiated over the value of ESC's remaining inventory and rights. ESC initially valued them at approximately $210,000, later adjusting to approximately $200,000 based on historical sales data showing that approximately 92% of Devolver products sold at full retail value. Devolver offered approximately $85,000—less than half of the documented value. No agreement was reached, and ESC retained the inventory. Devolver's willingness to pay $85,000 for rights and inventory it now claims ESC never had is a conduct-based admission that those rights exist and have substantial value. One does not negotiate a purchase price for something one believes does not exist.

**23. ESC's good faith notice and Devolver's own infringement.** On January 31, 2023, ESC sent formal written notice to Devolver advising that ESC intended to "produce, sell, license, and distribute all designs, in their entirety, that ESC produced before and after entering the Collaboration Agreement." ESC's notice expressly acknowledged "the 50% royalty due to Devolver from the sale of covered products"—reflecting the commission

structure in Schedule 1 of the Agreement, which provides for a fifty percent (50%) commission on all Collaboration Product sales.

24. Critically, ESC's January 2023 notice also identified Devolver's own unauthorized use of ESC's registered works. ESC stated: "Based on information available to us regarding Devolver merchandise, it has been making unauthorized reproductions and distributions of covered products for which it owes royalties to ESC." ESC identified five specific registered works that Devolver was using without authorization: ETG hat designs (Reg. No. VA0002204945), ETG ASH plush design (Reg. No. VA0002222854), ETG BLOODSHOT plush design (Reg. No. VA0002219354), ETG SHOTGUN toy design (Reg. No. VA0002220186), and Minit plush design (Reg. No. VA0002207143). ESC noted that "[a]s previously confirmed by your attorney, Devolver agreed to contact ESC should it want to make any use of ESC's works. But Devolver did not." The company now suing ESC for copyright infringement was itself committing copyright infringement against ESC.

25. **The eighteen-month silence.** Devolver never responded to ESC's January 31, 2023 notice. For eighteen months—from January 2023 to July 2024—Devolver ignored ESC's transparent communication, ESC's offer of royalties, and ESC's identification of Devolver's own infringement. When Devolver finally responded, it was not through a business dialogue but through Tyz Law Group's August 8, 2024 letter claiming ESC's rights are "patently false." ESC tried to resolve this as a business partner. Devolver responded by lawyering up and attacking.

26. **The demand to surrender copyrights.** On September 26, 2024, Jennifer Kelley of Tyz Law Group sent a follow-up email on Devolver's behalf demanding that ESC "voluntarily cancel the improperly-obtained copyright registrations" as an "absolutely

essential prerequisite" before Devolver would even schedule a discussion. Kelley stated: "To be clear—no such discussion would even be scheduled until we receive written proof that the registrations have been cancelled." This demand—that ESC destroy its own registered intellectual property portfolio as a precondition for dialogue—demonstrates that Devolver was not interested in resolution. It sought unconditional surrender.

### E. The Dennaton License Gap and Warranty Fraud

27. The *Hotline Miami* intellectual property is owned by Dennaton Games (developers Dennis Wedin and Jonatan Söderström), not Devolver. Devolver holds only a publishing license. Judge Pitman noted that Wedin is "the actual Hotline Miami IP owner." (Dkt. 18 at 9.)

28. Dennis Wedin has stated he had no knowledge of the agreements between Devolver and ESC. This raises serious questions about whether Devolver possessed the authority to grant the warranties it conveyed under the Agreement. If Devolver warranted rights it did not hold, Devolver breached its warranties and owes ESC indemnification under Section 19 of the Agreement. Moreover, Devolver's own lawsuit against ESC—alleging that ESC infringes rights Devolver warranted ESC could exercise—triggers the very indemnification obligation Devolver assumed.

### F. Dual-Court Judicial Validation of ESC's Rights

29. **Judge Pitman's Transfer Order (Dkt. 18, May 14, 2026).** Judge Pitman rejected Devolver's argument that the Agreement was terminated and found: (a) the forum selection clause is valid, mandatory, and enforceable; (b) the clause survived termination; (c) Devolver's "entire… relation with the IP stems from the Agreement" (Order at 7); (d)

all claims require Agreement interpretation, including "what is a 'Collaboration Product,' what did the license authorize, what survived termination, and whether ESC's works are 'authorized' or not" (Order at 7); and (e) Devolver failed to meet the "extremely high burden" of showing the forum selection clause should be set aside.

**30. Judge Chen's Sanctions Denial (Dkt. 529, May 14, 2026).** In *ESC-Toy, Ltd. v. Sony Interactive Entertainment LLC*, Case No. 3:21-cv-00778-EMC, Judge Chen denied sanctions against ESC, held that ESC "is thus not precluded from asserting its breach of contract claim," recognized ESC as a "sophisticated industry player," and credited ESC's independent creative contributions. (Order at 2, 4, 35.)

**31.** These rulings are dispositive of the central factual dispute. If the forum selection clause (a procedural provision) survives termination, Section 9's survivorship rights (substantive provisions) survive *a fortiori*. The Agreement that Devolver said was dead is alive. The rights that Devolver said ESC does not have exist. The products that Devolver called "unlicensed" are authorized.

### G. Devolver's Retaliatory Campaign

**32.** Devolver's campaign against ESC did not begin with the February 2026 lawsuit. It was in active preparation as early as October 2024, when Devolver voluntarily inserted itself into a federal case to which it was not a party in order to support an attack on ESC's credibility by Devolver's own lead investor.

**33.** On October 21, 2024, Sony Interactive Entertainment LLC ("SIE")—Devolver's lead investor—filed a Brief Re: Issue Sanctions Against ESC in *ESC-Toy, Ltd. v. Sony Interactive Entertainment LLC*, Case No. 3:21-cv-00778-EMC (N.D. Cal.) (Dkt. 408). SIE

had subpoenaed Devolver's records and weaponized the ESC-Devolver correspondence to argue that ESC was engaging in "questionable conduct" by pursuing "joint intellectual property interests with SIE" through Devolver.

34. Exactly one week later, on October 28, 2024, Devolver voluntarily appeared as a non-party in the SIE Action, filing a Statement in Support of SIE's administrative motion to seal (Dkt. 413) through its counsel Tyz Law Group. The accompanying Declaration of Brian Chadwick, Devolver's General Counsel, confirmed under oath that the sealed materials concerned "intellectual property rights and a dispute between Devolver Digital and a former business partner." (Dkt. 413-1 ¶ 3.) Devolver was not subpoenaed to appear. It volunteered—in coordination with SIE, its lead investor—to support the same sanctions effort that was targeting ESC's credibility.

35. In December 2025—fourteen months after inserting itself into the SIE Action— Devolver filed rush copyright registrations for the first time, more than six years after ESC's first registrations, in preparation for litigation.

36. On February 2, 2026, Devolver filed its Complaint against ESC in the Western District of Texas, in knowing violation of the mandatory Nevada forum selection clause in Section 24. The Complaint systematically omits the Sexton Letter, ESC's prior copyright registrations, and Section 9's survivorship clause. Judge Pitman subsequently found this venue selection improper and transferred the case to this Court.

37. Between February 25 and March 2026, Devolver, through Tyz Law Group, filed multiple waves of DMCA takedown notices with X and Instagram targeting Chatel's @erickscarecrow accounts. The notices contained knowingly false sworn statements, including: (a) a false statement that the lawsuit was filed in the "Northern District of

California" (it was filed in the Western District of Texas); (b) false characterization of ESC's products as "unlicensed derivatives"; (c) false denial of Chatel's collaborator status; and (d) false claims of copyright ownership when Devolver is a licensee, not the IP owner. The takedowns resulted in the temporary disabling of the @erickscarecrow Instagram account and the removal of nine posts on X.

38. On March 9, 2026, ESC's counsel demanded withdrawal of the DMCA notices. On March 12, Devolver's counsel refused to withdraw and declared Devolver "will continue to enforce its intellectual property rights as it sees fit."   Devolver's refusal to withdraw after being shown evidence of ESC's rights eliminates any good faith defense

**H. Devolver's Pattern of Inconsistent Positions and Material Omissions**

39. Devolver's litigation posture is built on a foundation of irreconcilable positions, selective disclosure, and the systematic concealment of evidence that undermines its own claims. The following pattern is not inadvertent—it is a deliberate strategy to mislead the Court.

40. **The "terminated but not terminated" paradox.** Devolver argued in the Western District of Texas that the Agreement was terminated and therefore the forum selection clause in Section 24 was "no longer operative." But Devolver's entire Complaint depends on the Agreement to define what a "Collaboration Product" is, what the license authorized, and what ESC was permitted to do. Judge Pitman identified this contradiction, finding that Devolver's "entire… relation with the IP stems from the Agreement" and that all claims require interpreting "what is a 'Collaboration Product,' what did the license authorize, what survived termination, and whether ESC's works are 'authorized' or not."

(Dkt. 18 at 7.) Devolver cannot simultaneously claim the Agreement is dead (to avoid the Nevada forum selection clause) and alive (to define the scope of its infringement claims).

**41. The Sexton-to-Kelley reversal.** On June 26, 2019, Devolver's own authorized counsel, David Sexton, acknowledged ESC's Section 9 rights, copyrightable contributions, and commission obligations. Five years later, on August 8, 2024, Devolver's new counsel at Tyz Law Group (Jennifer Kelley) took the exact opposite position: ESC's claim to co-own products is "patently false" and "any copyright in the Collaboration Products belongs to Devolver and/or its licensors alone." These are irreconcilable positions from the same party through different attorneys. The earlier position—the Sexton Letter—is a party-opponent admission under FRE 801(d)(2)(C)–(D) that Devolver cannot walk back through subsequent counsel's contrary assertions.

**42. The purchase attempt contradiction.** Prior to the Sexton Letter, Devolver attempted to purchase ESC's rights and inventory for approximately $200,000. ESC declined. One does not attempt to purchase rights one believes do not exist. Devolver's conduct-based admission that ESC's rights have value is directly contradicted by its litigation position that ESC possesses no rights at all.

**43. The systematic omissions in the Complaint.** Devolver's Complaint filed in the Western District of Texas omits: (a) the Sexton Letter—the single most important document in this dispute, in which Devolver's own counsel acknowledged ESC's rights; (b) ESC's 30+ federal copyright registrations, which predate Devolver's by over six years; (c) Section 9's survivorship clause, which grants ESC perpetual rights; (d) the pre-Agreement Kickstarter campaigns, which establish ESC's creative involvement before any written contract existed; and (e) Devolver's own purchase attempt, which demonstrates that

Devolver recognized ESC's rights. These are not random omissions. They are the precise pieces of evidence that undermine every claim Devolver asserts. Filing a complaint that conceals material exculpatory evidence from the Court is itself evidence of bad faith and is inconsistent with Devolver's obligations under Fed. R. Civ. P. 11(b).

44. **The copyright registration timing gap.** Devolver never registered any copyrights in *Hotline Miami* merchandise until December 2025—more than six years after ESC's first registrations in October 2019. Devolver then filed suit two months later citing those fresh registrations as the basis for its claims. Under 17 U.S.C. § 412, Devolver cannot recover statutory damages or attorney's fees for any infringement that occurred before its registration date. This timing gap is fatal to a substantial portion of Devolver's claimed damages and was concealed by the structure of the Complaint.

45. **The Dennaton ownership contradiction.** Devolver's DMCA notices claim authorization to act on behalf of "the copyright owner." But Devolver is not the copyright owner—Dennaton Games (Dennis Wedin) owns the *Hotline Miami* IP, and Devolver holds only a publishing license. Judge Pitman noted that Wedin is "the actual Hotline Miami IP owner." (Dkt. 18 at 9.) If Devolver does not own the copyrights, its sworn DMCA statements claiming ownership authority are false on their face. And if Devolver warranted to ESC that it held rights it did not actually possess, Devolver's own lawsuit triggers its Section 19 indemnification obligation—Devolver is suing ESC for doing exactly what Devolver warranted ESC could do.

46. **The wrong-court misrepresentation.** Devolver's DMCA notices state that Devolver "has filed a lawsuit… in the United States District Court for the Northern District of California." The lawsuit was filed in the Western District of Texas (Case No. 1:26-cv-

00248). This factual misrepresentation was made in a sworn statement signed under penalty of perjury. Whether careless or deliberate, it demonstrates that the notices were prepared without the diligence required for sworn statements and raises questions about the reliability of every other representation in those notices.

47. **The coordination timing.** Devolver's General Counsel characterized the ESC relationship as an active "intellectual property" dispute under oath in the Chadwick Declaration on October 28, 2024—four months before filing the Texas lawsuit and fourteen months before the DMCA takedowns. Yet Devolver did not file its complaint until February 2, 2026, after first rushing to register copyrights in December 2025. This sequence—sworn acknowledgment of a dispute in October 2024, registration preparation in December 2025, complaint filing in February 2026, DMCA campaign in February–March 2026—is not reactive enforcement. It is a premeditated campaign that was in active preparation while Devolver was simultaneously coordinating with SIE in the California litigation.

48. **The demand to destroy ESC's copyrights.** Devolver's own prior counsel acknowledged in the Sexton Letter that ESC's creative contributions constitute copyrightable elements. Yet on September 26, 2024, Devolver's new counsel demanded that ESC "voluntarily cancel" those same registrations as a precondition for any discussion. This is not merely an inconsistency—it is a demand that ESC destroy the very intellectual property that Devolver's own former counsel confirmed ESC owns. No party acting in good faith would demand that its counterparty surrender registered federal copyrights before agreeing to talk.

**49. The rejected litigation positions.** In its Opposition to Transfer (Dkt. 11), Devolver advanced the following arguments in sworn court filings: (a) the forum selection clause "did not survive termination of the Agreement"; (b) Section 9 grants only a "limited sell-off right" that "did not grant ESC-Toy the right to produce more inventory"; and (c) Devolver's claims "do not arise under or relate to the long-terminated Agreement." Judge Pitman rejected each of these arguments, finding the Agreement survives, its provisions are enforceable, and all claims require Agreement interpretation. Devolver advanced positions in sworn court filings that a federal judge found meritless—the same positions that underlie the DMCA notices and the Complaint itself.

**50.** Taken together, these inconsistencies and omissions demonstrate that Devolver has not pursued this litigation in good faith. Devolver has adopted whatever position serves its immediate tactical objective—claiming the Agreement is terminated when it wants to avoid Nevada, claiming the Agreement defines ESC's obligations when it wants to allege infringement, acknowledging ESC's rights when it wanted to purchase them, denying those rights when ESC refused to sell, demanding ESC destroy its copyrights as a precondition for dialogue, coordinating with its lead investor to attack ESC in one forum while preparing to file its own lawsuit in another, advancing positions in sworn filings that a federal judge has rejected, and omitting the most damaging evidence from its filings. This pattern supports each of Counterclaim Plaintiffs' claims and is independently relevant to Devolver's credibility before this Court.

### I. Destruction of the PM Studios Deal

**51.** Prior to Devolver's campaign, ESC was in advanced negotiations with PM Studios for a nine-game publishing deal based on *Hotline Miami* spinoff titles. The deal

contemplated $800,000 per title in development funding ($7.2 million total), a 60/40 revenue split favoring ESC, and 100% merchandise revenue to ESC. Clark McNair & Associates' forensic accounting analysis has established a damages floor of no less than $30 million, with the final report in progress.

**52.** Devolver's retaliatory campaign—the Texas lawsuit, the DMCA takedowns, and the public characterization of ESC as an infringer—foreseeably interfered with the PM Studios relationship. The deal collapsed as the dispute escalated.

### *J. Damages*

**53.** As a direct and proximate result of Devolver's conduct, Counterclaim Plaintiffs have suffered damages including:

(a) Lost revenue from the PM Studios deal collapse, valued at no less than $30 million per Clark McNair & Associates, with a final determination pending completion of the forensic accounting analysis;

(b) Lost commissions and revenue owed under the Agreement;

(c) Lost merchandise revenue from the DMCA takedown campaign and resulting social media disruptions;

(d) Lost revenue from the frozen product pipeline across more than ten gaming franchises due to the ongoing chilling effect of Devolver's DMCA threats;

(e) Reputational harm from being publicly characterized as an infringer;

(f) Attorney's fees and costs incurred in defending Devolver's improper-venue lawsuit and responding to false DMCA notices; and

(g) Costs of transfer from the Western District of Texas to this Court.

**COUNTERCLAIMS**

**COUNTERCLAIM I**

**BREACH OF CONTRACT**

**54.** Counterclaim Plaintiffs incorporate by reference Paragraphs 1 through 53.

**55.** A valid, enforceable contract exists between the parties—the Agreement—as confirmed by Judge Pitman's Transfer Order. Counterclaim Plaintiffs performed their obligations under the Agreement. Devolver materially breached the Agreement by: (a) failing to honor ESC's Section 9 survivorship rights; (b) directing the filing of DMCA takedown notices against products ESC has a contractual right to sell; (c) failing to pay commissions owed under the Agreement; (d) filing suit in the Western District of Texas in knowing violation of the mandatory forum selection clause in Section 24; (e) publicly characterizing ESC's authorized products as "unlicensed" and "infringing"; and (f) breaching Section 5's obligation to use good faith efforts to market Collaboration Products by directing a DMCA takedown campaign that destroyed ESC's primary marketing platform—the very internet and social media channels referenced in Section 5—through which ESC markets and sells Collaboration Products that generate commissions payable to Devolver under Section 8.

**COUNTERCLAIM II**

**DECLARATORY RELIEF**

**56.** Counterclaim Plaintiffs incorporate by reference Paragraphs 1 through 55.

**57.** An actual, justiciable controversy exists. Counterclaim Plaintiffs seek a declaration that: (a) Section 9 grants ESC a perpetual, exclusive right to sell and reproduce Collaboration Products; (b) ESC's original creative contributions across all franchises are independently copyrightable works owned by ESC; (c) ESC's character variants (SOAKED, DUSTED, MMM) are original works not derived from Devolver IP; (d) the Collaboration Provisions of the Agreement survive termination, as confirmed by Judge Pitman; and (e) Devolver's DMCA takedown notices were wrongfully filed.

**COUNTERCLAIM III**

**COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)**

**58.** Counterclaim Plaintiffs incorporate by reference Paragraphs 1 through 57.

**59.** ESC owns valid copyright registrations in its original creative contributions to the Collaboration Products, with registrations dating from October 2019—more than six years before Devolver's December 2025 registrations.

**60.** Devolver has used, reproduced, distributed, or displayed ESC's copyrighted works without authorization, including but not limited to: ETG hat designs (Reg. No. VA0002204945), ETG ASH plush design (Reg. No. VA0002222854), ETG BLOODSHOT plush design (Reg. No. VA0002219354), ETG SHOTGUN toy design (Reg. No. VA0002220186), and Minit plush design (Reg. No. VA0002207143)—works specifically identified in ESC's January 31, 2023 notice to Devolver. Devolver also used ESC's copyrightable elements in its December 2025 copyright registration applications, its Complaint, and its DMCA takedown notices. Such unauthorized use constitutes copyright infringement under 17 U.S.C. § 501.

**61.** Devolver's infringement is willful. In the Sexton Letter, Devolver's own counsel committed that Devolver would "contact [ESC] and negotiate an appropriate license fee" before using ESC's copyrightable elements. Devolver never contacted ESC and never negotiated any license fee. Instead, Devolver used ESC's works and then sued ESC for doing the same. Counterclaim Plaintiffs are entitled to enhanced statutory damages for willful infringement under 17 U.S.C. § 504(c)(2).

## COUNTERCLAIM IV

## KNOWING MATERIAL MISREPRESENTATION UNDER 17 U.S.C. § 512(f)

**62.** Counterclaim Plaintiffs incorporate by reference Paragraphs 1 through 61.

**63.** Devolver, through its authorized agents at Tyz Law Group, knowingly materially misrepresented that Counterclaim Plaintiffs' material was infringing when it directed the filing of DMCA takedown notices containing false sworn statements. "No reasonable copyright holder could have believed" that ESC's products were unlicensed given the Sexton Letter, Section 9, and ESC's 30+ prior registrations.  Devolver's March 12, 2026 refusal to withdraw after being shown evidence of ESC's rights eliminates any good faith defense.

## COUNTERCLAIM V

## BREACH OF WARRANTY AND INDEMNIFICATION

**64.** Counterclaim Plaintiffs incorporate by reference Paragraphs 1 through 63.

**65.** Under the Agreement, Devolver warranted that it possessed the rights necessary to grant ESC the license to create Collaboration Products. If Devolver did not hold those rights—because the *Hotline Miami* IP is owned by Dennaton Games, not Devolver, and

Dennaton's Dennis Wedin had no knowledge of the ESC-Devolver agreements—then Devolver breached its warranties. Devolver's false warranty induced ESC to invest years of creative effort and substantial capital into Collaboration Products across more than ten gaming franchises.

66. Under Section 19 of the Agreement, Devolver agreed to indemnify ESC against claims arising from the subject matter of the Agreement. Devolver's own Complaint—alleging that ESC infringes rights Devolver warranted ESC could exercise—triggers this indemnification obligation. Devolver is suing ESC for doing exactly what the Agreement authorized ESC to do.

## COUNTERCLAIM VI

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

67. Counterclaim Plaintiffs incorporate by reference Paragraphs 1 through 66.

68. Counterclaim Plaintiffs had an existing economic relationship with PM Studios for the nine-game publishing deal described in Paragraphs 51–52. Devolver knew or should have known of this relationship. Devolver engaged in wrongful conduct—filing a retaliatory lawsuit in an improper venue, directing the filing of false DMCA notices, and publicly characterizing ESC's products as infringing—that foreseeably interfered with the PM Studios relationship. As a proximate result, the deal collapsed, causing damages of no less than $30 million.

## COUNTERCLAIM VII

### ABUSE OF PROCESS

69. Counterclaim Plaintiffs incorporate by reference Paragraphs 1 through 68.

70. Devolver used legal process—the Texas lawsuit and the DMCA takedown procedure—primarily for purposes other than those for which they were designed. Devolver filed suit in Texas knowing the mandatory forum selection clause required Nevada. Devolver directed serial DMCA takedowns designed to trigger automated repeat-infringer policies rather than address specific infringement. These actions constitute abuse of process undertaken with an ulterior motive: to coerce ESC into surrendering its contractual and intellectual property rights.

## COUNTERCLAIM VIII

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

71. Counterclaim Plaintiffs incorporate by reference Paragraphs 1 through 70.

72. Under Nevada law, every contract contains an implied covenant of good faith and fair dealing. "Where the terms of a contract are literally complied with but one party to the contract deliberately contravenes the intention and spirit of the contract, that party can incur liability." Devolver breached this covenant by: (a) acknowledging ESC's rights through counsel (the Sexton Letter), then reversing that position to attack ESC; (b) attempting to purchase ESC's rights, and upon refusal, deploying litigation to destroy those rights; (c) filing suit in an improper venue to burden ESC with the cost of distant litigation; (d) directing DMCA takedowns containing false sworn statements against ESC's primary marketing platform; (e) omitting the Sexton Letter, ESC's prior registrations, and Section 9 from its Complaint to mislead the Court; and (f) actively destroying ESC's ability to market Collaboration Products through the DMCA campaign, thereby sabotaging the very commission revenue stream that Devolver is entitled to receive under Section 8. A party that destroys its own income stream to punish its business partner is not acting in good

faith—it is acting with the sole purpose of inflicting maximum economic harm. Each of these acts was undertaken in bad faith and with the purpose of depriving ESC of the benefits of the Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiffs pray for judgment against Devolver as follows:

A. Compensatory damages in an amount to be proven at trial, but not less than $30 million as established by the ongoing Clark McNair & Associates forensic analysis, plus additional damages for lost commissions, lost merchandise revenue, frozen product pipeline losses, and reputational harm;

B. Statutory damages under 17 U.S.C. §§ 501 and 512(f);

C. Indemnification under Section 19 of the Agreement;

D. Attorney's fees and costs pursuant to 17 U.S.C. § 512(f), Section 15 of the Agreement, and any other applicable statute;

E. Declaratory judgment as set forth in Counterclaim II;

F. Preliminary and permanent injunctive relief requiring withdrawal of all DMCA notices, reinstatement of all affected accounts, and prohibiting further DMCA notices;

G. Punitive damages for Devolver's willful, malicious, and bad faith conduct;

H. Prejudgment and post-judgment interest;

I. Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to FRCP 38(b), Counterclaim Plaintiffs demand a trial by jury on all issues so triable.

DATED this 5th day of June, 2026.

LEAH A. MARTIN, ESQ., P.C.

By: _____
LEAH A. MARTIN, ESQ.
Nevada Bar No. 7982
KEVIN HEJMANOWSKI, Esq.
Nevada Bar No. 10612
601 S. Rancho Drive, Suite C26
Las Vegas, Nevada 89106
*Attorney for Defendants/Counterclaimants*