Leah A. Martin, Esq.
Nevada Bar No. 7982
Kevin Hejmanowski, Esq.
Nevada Bar No. 10612
LEAH MARTIN LAW
601 South Rancho Drive, Suite C-26
Las Vegas, Nevada 89106
Telephone: (702) 420-2733
Facsimile: (702) 330-3235
lmartin@leahmartinlv.com
khejmanowski@leahmartinlv.com

Frank Felder Sommers, Esq.
(Pro Hac Vice Pending)
SOMMERS LAW PC
227 Princeton Avenue
Mill Valley, California 94941
Telephone: (415) 308-4004
ffs@sommerslawpc.com

Paul J. Steiner, Esq.
(Pro Hac Vice)
580 California Street, 12th Floor
San Fransico, California 94104

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DEVOLVER DIGITAL, INC.,<br>Plaintiff,<br><br>v.<br><br>ESC-TOY, LTD. and ERICK CHATEL,<br>Defendants.<br><br>ESC-TOY, LTD. and ERICK CHATEL,<br>Counterclaimans,<br><br>v.<br><br>DEVOLVER DIGITAL, INC., TYZ LAW GROUP PC, JONATHAN DOWNING, and DOES 1 – 100,<br>Counterdefendants. | **Case No. 2:26-cv-01534-APG-BNW**<br><br>**DEFENDANT ESC-TOY, LTD. AND ERICK CHATEL'S ANSWER AND AFFIRMATIVE DEFENSES, AND COUNTERCLAIM AGAINST DEVOLVER DIGITAL, INC., TYZ LAW GROUP PC AND JONATHAN DOWNING**<br><br>**Demand for Jury Trial** |

Defendants/Counterclaimants ESC-Toy, Ltd. ("ESC") and Erick Chatel ("Chatel"), individually and doing business as Erick Scarecrow (collectively, "Defendants/Counterclaimants"), by and through their undersigned attorneys, hereby answer Plaintiff Devolver Digital, Inc.'s ("Devolver") Complaint for Copyright and Trademark Infringement and False Designation of Origin (the "Complaint") as follows. To the extent any allegation of the Complaint is not expressly admitted, it is denied.

## ANSWER

### *Response to "Nature of the Case" (Paragraphs 1–3)*

1. Defendants deny the allegations in Paragraph 1 of the Complaint. Defendants deny that their activities constitute "unauthorized and extensive exploitation" of any intellectual property. The Fulfillment and Collaboration Agreement ("Agreement") grants ESC perpetual survivorship rights under Section 9, as confirmed by The Honorable Judge Pitman's Transfer Order. Defendants further deny that they have deceived consumers or falsely suggested an affiliation with Devolver that does not exist; Defendants' products are Collaboration Products authorized by the Agreement.

2. Paragraph 2 contains characterizations and legal conclusions to which no response is required. To the extent a response is required, Defendants deny that Devolver's "core values" are "threatened" by Defendants' authorized activities.

3. Defendants admit that Devolver claims to be an exclusive licensee of certain Hotline Miami copyrights and trademarks. Defendants deny that Devolver is the owner of such copyrights, as the Hotline Miami IP is owned by Dennaton Games (Dennis Wedin), not Devolver. Judge Pitman noted that Wedin is "the actual Hotline Miami IP owner."

Defendants deny that they have infringed or are continuing to infringe any valid intellectual property right of Devolver.

### Response to "Parties," "Jurisdiction," and "Venue" Allegations

Defendants admit the allegations regarding the identity of the parties to the extent consistent with the public record. Defendants admit that this Court has subject matter jurisdiction. Defendants deny that venue was proper in the Western District of Texas, as confirmed by Judge Pitman's Transfer Order enforcing the mandatory forum selection clause in Section 24 of the Agreement designating Clark County, Nevada. Defendants deny all remaining jurisdictional and venue allegations to the extent they are inconsistent with the Transfer Order.

### Response to Factual Allegations

Defendants respond to the factual allegations of the Complaint as follows:

To the extent the Complaint alleges that the Agreement was a "one-off, limited merchandising agreement," Defendants deny this characterization. The Agreement established a perpetual collaboration framework under which ESC served as lead creative designer for all Collaboration Products across more than ten gaming franchises. The Agreement contains no work-for-hire clause, no IP assignment provision, and grants ESC perpetual survivorship rights under Section 9.

To the extent the Complaint alleges that Defendants' products are "unauthorized" or "unlicensed," Defendants deny these allegations. Section 9 of the Agreement grants ESC the exclusive right to sell all Collaboration Products following termination with no time limitation. The Honorable Judge Pitman confirmed that the Agreement's provisions survive termination.

To the extent the Complaint alleges that Defendants' copyright registrations were obtained improperly or fraudulently, Defendants deny these allegations. ESC's 30+ copyright registrations, dating from October 2019, predate Devolver's December 2025 registrations by over six years. Devolver's own authorized counsel acknowledged ESC's copyrightable contributions in the Sexton Letter of June 26, 2019.

To the extent the Complaint alleges that Defendants' use of Devolver's trademarks is unauthorized, Defendants deny these allegations. Defendants' use of the DEVOLVER DIGITAL and HOTLINE MIAMI marks is authorized by the Agreement and constitutes nominative fair use in identifying the collaborative nature of the products.

To the extent the Complaint characterizes Devolver as the "owner" of the Hotline Miami copyrights, Defendants deny this allegation. Devolver is a licensee, not the owner. The Hotline Miami IP is owned by Dennaton Games.

Defendants deny all remaining factual allegations of the Complaint not expressly admitted herein, and specifically deny that any of their conduct constitutes infringement, unfair competition, false designation of origin, or any other actionable wrong.

The Complaint systematically omits material facts, including but not limited to: (a) the Sexton Letter, in which Devolver's own counsel acknowledged ESC's rights; (b) ESC's 30+ prior copyright registrations; (c) Section 9's survivorship clause; (d) the pre-Agreement Kickstarter campaigns; (e) Devolver's $85,000 purchase attempt; and (f) ESC's January 31, 2023 good faith notice offering royalties. These omissions are detailed in Defendants' Counterclaims below.

///

///

### *Response to First Cause of Action*

### *Trademark Infringement (15 U.S.C. § 1114)*

Defendants deny the allegations of the First Cause of Action. Defendants' use of the DEVOLVER DIGITAL and HOTLINE MIAMI marks is authorized under the Agreement and constitutes nominative fair use. Defendants deny that their conduct has caused or is likely to cause consumer confusion. Defendants further deny that this is an "exceptional case" warranting attorneys' fees to Devolver.

### *Response to Second Cause of Action*

### *False Designation of Origin (15 U.S.C. § 1125(a))*

Defendants deny the allegations of the Second Cause of Action. Defendants' descriptions of their products as created in collaboration with Devolver and Hotline Miami are truthful—ESC is a collaborator, as confirmed by the Agreement, the Kickstarter campaigns, and the Sexton Letter. Defendants deny any false designation of origin.

### *Response to Third Cause of Action*

### *Copyright Infringement (17 U.S.C. § 501)*

Defendants deny the allegations of the Third Cause of Action. Defendants' works are original creative contributions independently copyrightable under 17 U.S.C. § 102. ESC's character variants, sculptural designs, and packaging art do not copy Devolver's (or Dennaton's) underlying IP but constitute original works of authorship. Defendants further note that Devolver's December 2025 copyright registrations postdate ESC's by over six years, and under 17 U.S.C. § 412, Devolver cannot recover statutory damages or attorney's fees for any infringement that allegedly occurred before its registration date.

///

**AFFIRMATIVE DEFENSES**

Without assuming the burden of proof on any issue for which Devolver bears the burden, Defendants assert the following Affirmative Defenses:

**FIRST DEFENSE — License and Authorization.** Defendants' activities are licensed and authorized under the Agreement, including but not limited to Section 9's perpetual survivorship right, as confirmed by the Honorable Judge Pitman's Transfer Order.

**SECOND DEFENSE — Copyright Ownership.** Defendants own valid, registered copyrights in their original creative contributions to the Collaboration Products, with registrations dating from October 2019. Devolver's own authorized counsel acknowledged ESC's copyrightable contributions in the Sexton Letter.

**THIRD DEFENSE — Independent Creation.** Defendants' works, including character variants, original character designs, stories, sculptural designs, and packaging art, are independently created works of authorship not derived from or copying Devolver's underlying IP.

**FOURTH DEFENSE — Nominative Fair Use.** Defendants' use of the DEVOLVER DIGITAL and HOTLINE MIAMI marks constitutes nominative fair use to truthfully identify the collaborative nature of the products.

**FIFTH DEFENSE — Estoppel.** Devolver is estopped from asserting the claims in the Complaint by reason of its prior admissions through authorized counsel (the Sexton Letter), its conduct-based admissions (the $85,000 purchase attempt), and its 18-month silence following ESC's January 2023 good faith notice.

**SIXTH DEFENSE — Unclean Hands.** Devolver's claims are barred by the doctrine of unclean hands. Devolver filed knowingly false DMCA takedown notices,

omitted material exculpatory evidence from the Complaint, filed suit in the wrong venue, and took irreconcilable litigation positions, as detailed in Defendants' Counterclaims.

**SEVENTH DEFENSE — Waiver.** Devolver waived any claims against Defendants by acknowledging ESC's rights through the Sexton Letter, accepting ESC's commission payments under Section 8 for years following termination, and failing to respond to ESC's January 2023 notice for eighteen months.

**EIGHTH DEFENSE — Laches.** Devolver's claims are barred by laches. Devolver was aware of Defendants' activities since at least June 2019 (the Sexton Letter) and took no enforcement action until February 2026—a delay of nearly seven years during which ESC invested substantial resources in developing its creative portfolio.

**NINTH DEFENSE — Section 19 Indemnification Offset.** Under Section 19 of the Agreement, Devolver is obligated to indemnify ESC against any claims arising from Devolver's breach of the Section 18 warranties, including reasonable outside attorneys' fees. Any award to Devolver is subject to offset by ESC's indemnification claim.

**TENTH DEFENSE — 17 U.S.C. § 412 Registration Bar.** Under 17 U.S.C. § 412, Devolver cannot recover statutory damages or attorney's fees for any alleged infringement that commenced before Devolver's December 2025 copyright registrations. ESC's registrations predate Devolver's by over six years.

**ELEVENTH DEFENSE — First Sale Doctrine.** To the extent Devolver's claims relate to the resale of previously authorized Collaboration Products, such claims are barred by the first sale doctrine under 17 U.S.C. § 109(a).

///

///

**TWELFTH DEFENSE — Copyright Misuse.** Devolver's copyright claims are barred by the doctrine of copyright misuse. Devolver has used its claimed copyrights to suppress competition and destroy ESC's business through false DMCA takedowns, rather than to protect legitimate creative interests, and in direct violation of Devolver's Section 5 obligation to market Collaboration Products in good faith.

**THIRTEENTH DEFENSE — Failure to Mitigate.** Devolver failed to mitigate its alleged damages by refusing to accept the royalties ESC offered in January 2023, refusing to negotiate in good faith, and instead pursuing a retaliatory litigation and DMCA campaign that increased rather than reduced any alleged harm. Devolver's campaign destroyed rather than preserved value, including ESC's prospective PM Studios publishing relationship.

**FOURTEENTH DEFENSE — Failure to State a Claim.** The Complaint fails to state a claim upon which relief can be granted as to each cause of action.

**SIXTEENTH DEFENSE — Absence of Likelihood of Confusion.** Devolver's trademark registrations cover computer game software and online retail services (Classes 009 and 035), not collectible merchandise, figures, pins, plush toys, or sculptural works. Defendants' products operate in a different class of goods and are not likely to cause consumer confusion with Devolver's registered goods and services.

**SEVENTEENTH DEFENSE — Setoff for Devolver's Own Infringement.** Devolver's claims are barred or subject to set off by reason of Devolver's own infringement of Defendants registered copyrights, including five specific works identified in ESC's January 31, 2023 notice, which Devolver never disputed or responded to for eighteen months.

///

**EIGHTEENTH DEFENSE — Reservation of Defenses.** Defendants reserve the right to assert additional affirmative defenses as discovery progresses and additional facts become known. Defendants further reserve the right to amend the Counterclaims to identify and add Does 1 through 100, including any persons or entities who directed, authorized, or ratified Devolver's wrongful conduct.

**DEFENDANTS' COUNTERCLAIMS AGAINST DEVOLVER DIGITAL, INC., TYZ LAW GROUP PC, JONATHAN DOWNING, AND DOES 1–100**

Defendants/Counterclaimants ESC-Toy, Ltd. ("ESC") and Erick Chatel ("Chatel"), individually and doing business as Erick Scarecrow by and through their counsel of record, LEAH MARTIN, ESQ. and KEVIN HEJMANOWSKI, ESQ., of the law firm of LEAH MARTIN LAW, hereby assert the following Counterclaims against Plaintiff Devolver Digital, Inc. ("Devolver"), Tyz Law Group PC ("Tyz"), and Jonathan Downing ("Downing") (collectively "Counterdefedants") as follows:

**PRELIMINARY STATEMENT**

1.     Defendants/Counterclaimants ESC-Toy, Ltd. and Erick Chatel, individually and doing business as Erick Scarecrow, assert the following Counterclaims against Devolver Digital, Inc., Tyz Law Group PC, and Jonathan Downing. Counterdefendants Tyz Law Group PC, and Jonathan Downing are joined pursuant to Fed. R. Civ. P. 13(h) and 20(a)(2) as the claims against them arise from the same series of transactions or occurrences as the claims between Defendant/Counterclaimants and Plaintiff Devolver Digital, Inc., and common questions of law and fact will arise.

2.     On May 14, 2026, two Federal District Court Judges issued orders confirming the falsity of the positions Plaintiff Devolver and its counsel have taken against Defendant ESC-Toy, Ltd. Despite Devolver's denial, the Honorable Judge Pitman found

the Fulfillment and Collaboration Agreement remains valid and enforceable, and that the forum selection clause survived termination, and that Plaintiff Devolver's "entire relation with the [Hotline Miami] IP stems from the Agreement." Concurrently, on the same day, the Honorable Judge Chen denied sanctions against Defendant and recognized ESC-Toy, Ltd. as a "sophisticated industry player."

3.      These findings completely undermine the premise of Plaintiff's Complaint and expose the expressly false allegations of the DMCA takedown notices that Counterdefendants Tyz Law Group PC and Downing filed on Plaintiff Devolver's behalf. What remains is the truth, that being Devolver exploited Defendants' creative talent across more than ten gaming franchises, acknowledged Defendants' rights through its own counsel of record, attempted to purchase those rights; and, when Defendant refused to sell, Plaintiff launched a retaliatory campaign through Counterdefendant Tyz Law Group, PC, which was designed to destroy the very business it helped create. This action seeks damages that Counterdefendants have created by their wrongful exploitation attempts.

## PARTIES

4.      Defendant/Counterclaimant ESC-Toy, Ltd. is a Nevada corporation with its principal place of business in Las Vegas, Nevada.

5.      Defendant/Counterclaimant Erick Chatel, known professionally as "Erick Scarecrow," is an individual residing in Las Vegas, Nevada.

6.      Plaintiff/Counterdefendant Devolver Digital, Inc. is a corporation organized under the laws of Texas with its principal place of business in Austin, Texas.

7.      Counterdefendant Tyz Law Group PC is a California professional corporation with its principal place of business at 1 Embarcadero Center, Suite 1200, San Francisco,

California 94111. Counterdefendant directed, prepared, and filed the false DMCA takedown notices at issue.

8. Counterdefendant Jonathan Downing (California Bar No. 341660) is an attorney employed by Tyz Law Group, PC, who personally signed, under penalty of perjury, each DMCA takedown notices containing knowingly false statements.

9. Does 1 through 100, including, but not limited to Devolver's officers, directors, investors and corporate affiliates, including any other persons who directed, authorized, or ratified the wrongful conduct alleged herein.

10. Counterclaimants are informed and believe, and allege that each Doe Counterdefendant, is in some manner, though not presently identified, legally responsible for the events and happenings alleged herein, and thusly caused damages to Counterclaimants.

Counterclaimants reserve the right to amend these Counterclaims to substitute the true names and capacities of Does 1 through 100 when ascertained through discovery or otherwise, and assert additional claims against such Doe Counterdefendants as warranted by the evidence.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. Counterclaims against Plaintiff Devolver are compulsory under Fed. R. Civ. P. 13(a). Counterdefendants Tyz Law Group, PC and Downing are joined under Fed. R. Civ. P. 13(h) and 20(a)(2).

12. Venue is proper pursuant to the Honorable Judge Pitman's Transfer Order enforcing the mandatory forum selection clause in Section 24.

13.     This Court has personal jurisdiction over Counterdefendants Tyz and Downing under the Calder effects test. Counterdefendants intentionally directed tortious conduct, filing knowingly false DMCA notices at Defendant ESC-Toy, Ltd., a Nevada corporation. The notices targeted Counterclaimants' social media accounts, which serve as the primary marketing platform for Counterclaimant ESC-Toy, Ltd., Nevada based business. The damages were suffered in Nevada. Counterdefendants knew Defendant ESC-Toy, Ltd. is a Nevada corporation due to the Agreement, and designates Nevada law and a Nevada jurisdiction. Counterdefendant Tyz Law Group PC also acted in concert with Plaintiff Devolver Digital, Inc., a party subject to this Court's jurisdiction.

### FACTUAL ALLEGATIONS

A.      ESC-Toy, Ltd.'s Industry Presence and Devolver Digital, Inc.'s

Pursuit of ESC-Toy, Ltd.

14.     The Honorable Judge Chen found, Defendant ESC was a "sophisticated industry player independently familiar with video game licensing practices" with "nearly a decade of direct dealing" with Sony Interactive Entertainment spanning sixteen titles.

15.     Prior to the Devolver collaboration, Defendants received multiple industry awards between 2005 and 2013, including Brand of the Year and Artist of the Year. It was this reputation that led Plaintiff to approach Defendant to do business on or about February 2014. Defendant did not approach Plaintiff to collaborate to conduct business. Rather, Plaintiff approached Defendant for potential business opportunities.

16.     On or about August 2014, approximately eight months before the Agreement between Devolver and ESC collaborating, Defendant launched Kickstarter campaigns, and credited equally to "Dennaton, Devolver Digital and esctoy.com." No written assignment

exists for these pre-Agreement works. Under 17 U.S.C. § 204(a), Defendant Chatel's Pre-Agreement contributions are owned by Defendant Chatel alone.

### B. The Fulfillment and Collaboration Agreement.

17.    On April 30, 2015, Devolver and ESC entered into the Agreement, governed by Nevada law. Pursuant to Section 9, it therefore grants Defendant the exclusive right to sell all Collaboration Products, post-termination, with no time limitation. ESC's right to reproduce the Collaboration Products is an incident of its ownership of the underlying works. ESC authored and registered the sculptural graphic designs, along with the story embodied in those products and holds the exclusive right to reproduce them under 17 U.S.C. § 106(1); Section 13 confirms that ESC "retain[s] legal ownership for all Collaboration Products" and "handles the design and production of the product".  The Sexton Letter acknowledged ESC's reproduction rights and Devolver's obligation to negotiate a license before any use of the aforementioned product, to which the Honorable Judge Pitman confirmed that the provisions survive.

18.    The Agreement contains no work-for-hire clause, no IP assignment provision, and no arbitration clause. Schedule 1 establishes a 50% commission on Collaboration Product sales. Section 5 obligates Devolver to "use good faith efforts to market… Collaboration Products… via internet and social media."

### C. ESC's Creative Portfolio Across 10+ Franchises

19.    Counterclaimant Chatel created original creative assets for Collaboration Products spanning; including, but not limited to: Hotline Miami, Enter the Gungeon, GRIS,

My Friend Pedro, EITR, APE OUT, Minit, Dropsy, as well as additional titles. Counterclaimant ESC-Toy, Ltd. holds over 30 business title registrations dating from October 2019, well over six years prior to Devolver's December 2025 registrations.

D. Devolver Digital, Inc.'s Acknowledgment of ESC-Toy, Ltd.'s Rights.

20.     On June 26, 2019, David Sexton, Devolver's counsel of record, acknowledged Defendant ESC-Toy, Ltd.'s Section 9 rights, copyrightable contributions, Section 8 commission obligations, and committed to "contact [ESC] and negotiate an appropriate license fee" before using Defendant ESC-Toy, Ltd.'s creative assets. This is a party-opponent admission under FRE 801(d)(2)(C)–(D). Devolver subsequently used ESC's creative assets without contacting Defendants, and without negotiating, making an offer or paying any license fee.

21.     Devolver unsuccessfully attempted to purchase Defendant ESC-Toy, Ltd.'s rights and inventory. Devolver offered $85,000 for ESC's rights and inventory. ESC valued its assets at approximately $200,000. Thus, no deal was reached between the parties. In an itemized invoice dated April 3, 2019, ESC valued the goods at $210,117.56, later revised to $207,146.52. At that time the ESC-Toy, Ltd. managed Devolver store had generated at least $412,000 in revenue. Devolver did not dispute that payment was owed, on April 3, 2019, Nigel Lowrie wrote that Devolver "want[ed] to provide payment for potential revenue lost;" with the only dispute being the amount owed to Defendants. Plaintiff was initially willing to provide payment for goods and rights it now claims ESC never held, which is a party-opponent admission under FRE 801(d)(2) confirming that those rights existed and had substantial value.

22.    The investor motive. Nigel Lowrie disclosed that new investors did not want ESC holding the exclusive contract, potentially revealing the true motive, that of investor pressure to extinguish a perpetual contract, not Defendants' conduct. Contemporaneously, on March 6, 2019, while advising that distribution would move to another partner, Nigel Lowrie confirmed that Devolver "still plan[ned] on working with ESC-Toy, Ltd. on product design and creation." This being a party-opponent admission that ESC was a creative partner, not a mere fulfillment vendor, and the wind-down reflected a distribution and investor decision rather than any deficiency in ESC's creative contributions.

23.    Defendants' good faith efforts and Plaintiff's own infringement, can be noted that on January 31, 2023, ESC gave formal notice of its rights and acknowledged "the 50% royalty due to Devolver." ESC also identified five registered works Devolver was using without authorization: ETG hat designs (VA0002204945), ETG ASH plush (VA0002222854), ETG BLOODSHOT plush (VA0002219354), ETG SHOTGUN toy (VA0002220186), and Minit plush (VA0002207143). The company suing Defendants for infringement was itself infringing ESC's copyrights. Defendants further documented that Devolver was producing and selling, through its own e-commerce store at merch.devolverdigital.com, merchandise derived from Defendants' collaboration designs without authorization or royalties; including, a "Devolver Mutant Plush," an Enter the Gungeon "Yesterday Strikes" shirt, and Enter the Gungeon beanie/hat designs, which was discovered on or about April 1, 2020. The beanie/hat designs correspond to ESC's registered ETG hat design (Reg. No. VA0002204945) in 2017. Devolver, through Kate Ludlow, requested that ESC create Enter the Gungeon beanie concepts; ESC submitted multiple original concepts; and, Devolver, without advising ESC, produced and sold said beanie

products in 2020 and paid Defendants no royalties. Each item Plaintiff sold is a Collaboration Product that Defendants own and created. Under Section 13 of the Agreement, "ESC will retain legal ownership for all Collaboration Products," and for such products "ESC handles the design and production." Plaintiff sales thus disposed of Defendants' own property and usurped Defendants' exclusive right to sell the remainder of all Collaboration Products, which "shall survive the termination of this Agreement" (Section 9). ESC placed Devolver on formal written notice on January 31, 2023, identifying the registered works and Devolver's unauthorized reproductions and reciting that Devolver's "unilateral sale of such covered products infringes ESC's copyrights"; to which Devolver did not respond.

24.   Devolver was silent for approximately eighteen months. Devolver never responded to any of Defendants' attempts to resolve the conflicts as a partner. Devolver finally responded eighteen months later by hiring Counterdefendant Tyz Law Group PC to commence the subject litigation.

E.    Tyz Law Group, PC Independent Tortious Conduct

25.   On August 8, 2024, Jennifer Kelley of Counterdefendant Tyz Law Group, PC claimed ESC's co-ownership is "patently false", which directly contradicted the Sexton Letter. On September 26, 2024, Kelley demanded ESC to "voluntarily cancel" its copyright registrations as a precondition for discussion.

26.   October 28, 2024, Tyz voluntarily appeared in ESC-Toy, Ltd. v. Sony Interactive Entertainment, LLC ("SIE") (United States District Court, Northern District of California, Case No. 3:21-cv-00778-EMC), coordinating with SIE one week after SIE weaponized ESC-Devolver correspondence. Attorney Chadwick, Devolver's General Counsel, declared under oath the materials concerned "intellectual property rights and a

dispute between Devolver Digital and a former business partner", not naming ESC as the former business partner.

27. Between February 25 and March 2026, Counterdefendant Downing filed DMCA takedown notices from Tyz's offices containing false sworn statements: (a) false venue ("Northern District of California" vs. Western District of Texas); (b) false "unlicensed derivatives" characterization; (c) false denial of collaborator status; (d) false copyright ownership claims when Devolver is a licensee; and (e) reliance on registrations six years after ESC's.

28. On March 12, 2026, Chieh Tung refused to withdraw the takedown notices and declared Devolver "will continue to enforce its intellectual property rights as it sees fit." This eliminates any good faith defense.

### F. The Dennaton License Gap and Joint Authorship

29. The Hotline Miami IP is owned by Dennaton Games (Dennis Wedin), not Devolver. Judge Pitman noted Wedin is "the actual Hotline Miami IP owner." Wedin stated he had no knowledge of the ESC and Devolver agreements. Devolver's DMCA notices claiming copyright owner authority patently false.

30. Defendant/Counterclaimant Chatel co-created multiple works directly with Wedin and Söderström of Dennaton, including original colorway variants, original character designs / interpretations, story plots and sculptural designs developed through direct creative collaboration with the IP owners themselves. Under 17 U.S.C. § 101, these jointly authored works cannot belong to Devolver, a licensee alone. The fact that the actual IP owners chose to collaborate creatively with Chatel undermines any characterization of ESC's contributions

as "mere reproduction" and confirms that ESC's creative relationship extended beyond Devolver directly to the rights holders.

31.    Despite Wedin's statement that he had no knowledge of the ESC and Devolver agreements, the August 8, 2024 letter authored by Attorney Kelley, of Counterdefendant Tyz's law firm claimed: "Indeed, the owner of the Hotline Miami IP… is aware of your clients' unauthorized sale of goods incorporating that IP… and expects us to take action." Either Tyz falsely represented Dennaton's support to coerce ESC into surrendering its rights, or Devolver misrepresented Dennaton's position to its own counsel. Regardless of either representation, the enforcement campaign may have been launched without the actual IP owner's informed authorization.

### G. Dual-Court Judicial Validation

32.    The Honorable Judge Pitman's Transfer Order rejected Devolver's position and found that all claims related to, or at least arise from the Agreement, and require Agreement interpretation.

33.    The Honorable Judge Chen's sanction denial, recognized ESC as a "sophisticated industry player."

34.    If the forum selection clause survives termination, Section 9's survivorship rights survive a fortiori. The positions Tyz embedded in its DMCA notices have been rejected by a federal judge.

### H. The Coordinated Retaliatory Campaign

35.    The campaign began in October 2024 (Devolver's SIE Action appearance), escalated through December 2025, via rush copyright registrations. By February 2026, a wrong-venue lawsuit was filed. By February–March 2026, there were attempted DMCA

takedowns, which continued through March 12, 2026, due to refusal to withdraw. The social media platform Instagram reviewed ESC's contracts and reinstated the account, thus confirming the takedowns were wrongful.

36.    The DMCA campaign created an ongoing chilling effect. Multiple ESC projects across 10+ franchises are on hold. The effect is not speculative—it is the direct consequence of Tyz's documented refusal to cease.

I. Pattern of Inconsistent Positions

37.    Devolver and Tyz have adopted irreconcilable positions:

(a) The "terminated but not terminated" paradox;

(b) The Sexton-to-Kelley reversal;

(c) The purchase attempt contradiction;

(d) Systematic omissions of the Sexton Letter, ESC's registrations, Section 9, Kickstarter campaigns, and the purchase attempt;

(e) The § 412 registration timing gap;

(f) The Dennaton ownership contradiction;

(g) The wrong-court misrepresentation;

(h) The coordination timing, i.e. – a 19-month premeditated campaign;

(i) The copyright cancellation demand;

(j) The Honorable Judge Pitman's rejected litigation positions; and

(k) Marketing sabotage, such as destroying the channels Section 5 obligates Devolver to utilize;

(l) The Dennaton awareness fabrication regarding Tyz Law Group's letter from attorney Kelley claiming the Hotline Miami IP owner "is aware" of ESC's activities and "expects us to take action," though Dennis Wedin subsequently stated he had no knowledge of the ESC-Devolver agreements;

(m) Deliberate exclusion of Studio Supr Rico, LLC ("SSR"), Devolver omitted SSR (a Nevada LLC) from the Texas complaint to avoid strengthening the Nevada venue argument, a tactical omission confirming Devolver was searching for a venue and/or jurisdiction anywhere but Nevada.

(n) Devolver cited ESC's May 31, 2019 Smolansky letter, which mischaracterized the wording in said letter, wherein Devolver's Opposition stated said letter reflected only a "narrow surviving right." However, the letter explicitly reserved "all rights, including copyright, to any and all of ESC's creative contributions" and required "a license fee to be negotiated in good faith"; and

(o) Devolver described ESC as a "one-man shop" in its Opposition to minimize ESC's credibility. This wholly mischaracterizes ESC, and damaged ESC's reputation. The Honorable Judge Chen recognized ESC as a "sophisticated industry player" with "nearly a decade of direct dealing" spanning sixteen titles.

38.    The fifteen documented inconsistencies and omissions, noted *supra*, is not inadvertent. It reflects Counterdefendants deliberate strategy to mislead the courts and destroy Counterclaimants' business.

///

J. Destruction of the PM Studios Deal

39.    ESC was in advanced negotiations with PM Studios for a nine-game deal valued at no less than $30 million, based on the preliminary analysis of ESC's forensic expert. The campaign conducted by Counterdefendants destroyed the relationship with PM Studios. ESC's expert's final forensic valuation report is nearing completion and will be disclosed upon completion therein

K. Damages

40.    As a direct result of the conduct of Counterdefendants, Counterclaimants have suffered:

(a) PM Studios deal collapse, potentially no less than $30 million business deal;

(b) Lost commissions and royalties;

(c) Lost merchandise revenue from the DMCA campaign;

(d) Frozen product pipeline including over ten franchises;

(e) Inability to develop self-published video games;

(f) Reputational harm;

(g) Lost non-Devolver collaboration revenue;

(h) Attorney's fees across multiple forums; and

(i) Costs of transfer.

///

///

///

## COUNTERCLAIMS

### COUNTERCLAIM I — BREACH OF CONTRACT
### (Against Devolver)

41.     Counterclaimants reallege and incorporate Paragraphs 1–40.

42.     Devolver breached the Agreement inter alia by: (a) failing to honor Section 9; (b) directing DMCA takedowns against authorized products; (c) failing to pay commissions; (d) filing in the wrong venue to delay ESC from conducting business; (e) characterizing authorized products as "unlicensed"; and (f) breaching Section 5's marketing obligation and ultimately destroying ESC's internet and social media channels. Sabotaging the commission revenue under Section 8. Most damaging, Devolver itself reproduced and sold Collaboration Products that ESC owns and was exclusively entitled to sell: Section 13 provides that "ESC will retain legal ownership for all Collaboration Products," and Section 9 provides that ESC's "exclusive right to sell the remainder of all Collaboration Products shall survive the termination of this Agreement." By selling the Mutant Plush, Enter the Gungeon apparel, and the ETG hat and beanie designs through its own store, Devolver breached Sections 9 and 13 and deprived ESC of the fifty-percent Commission ESC would have earned on those sales under Schedule 1.

### COUNTERCLAIM II — DECLARATORY RELIEF
### (Against Devolver and Tyz)

43.     Counterclaimants reallege and incorporate Paragraphs 1–43.

44.     Counterclaimants seek declarations that: (a) Section 9 grants perpetual rights; (b) ESC's creative contributions are independently copyrightable; (c) Collaboration

Provisions survive termination; (d) DMCA notices were wrongful; and (e) Tyz and Downing are enjoined from further notices.

**COUNTERCLAIM III — COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)**
**(Against Devolver)**

45.     Counterclaimants reallege and incorporate Paragraphs 1–44.

46.     Devolver used five specific registered works without authorization. The Sexton Letter committed Devolver to negotiate a license, to which Devolver never did get a license. Enhanced damages under 17 U.S.C. § 504(c)(2). Devolver's unauthorized uses are not limited to the above referenced five works: Devolver also produced and sold, through its own e-commerce store, merchandise derived from ESC's collaboration designs, including the Devolver Mutant Plush, Enter the Gungeon apparel, and the Enter the Gungeon beanie/hat designs corresponding to Reg. No. VA0002204945, all without authorization or royalties. Each of these works was authored by ESC, as the Agreement recites that, for Collaboration Products, "ESC handles the design and production of the product" (Section 13), and is owned by ESC, as reflected in ESC's copyright registrations, and in Section 13's provision that "ESC will retain legal ownership for all Collaboration Products." The ETG hat and beanie designs (Reg. No. VA0002204945) are dispositive on the question of authorization. Devolver, through Kate Ludlow, commissioned those concepts from ESC in 2017, then reproduced and sold them in 2020. Therefore, Devolver cannot brand as "unauthorized" the very designs it asked ESC to create. Devolver's reproduction and sale of ESC's copyrighted and ESC owned works, without the license the Sexton Letter required, was willful, entitling ESC to Devolver's profits and actual damages under 17 U.S.C. § 504(b), in addition to the fifty-percent Commission those sales would have yielded under Schedule 1.

**COUNTERCLAIM IV — KNOWING MATERIAL MISREPRESENTATION**
**(17 U.S.C. § 512(f))**
**(Against Devolver, Tyz, and Downing)**

47.     Counterclaimants reallege and incorporate Paragraphs 1–46.

48.     "No reasonable copyright holder could have believed" ESC's products were unlicensed. Devolver's actual knowledge that ESC's products were authorized is established by the Agreement itself. Devolver granted ESC a worldwide license to market and sell the Collaboration Products (Section 4), warranted that their sale "will not violate or infringe the rights of any third party(ies)" (Section 18(c)), and bound itself to "use good faith efforts to market… Collaboration Products… via internet and social media" (Section 5). A copyright holder contractually obligated to market the very products as authorized goods; and, that warranted those products do not infringe, nor cannot have formed a subjective good-faith belief that the same products are infringing; the sworn statements to X and Meta that ESC's products were "unlicensed derivatives" were therefore knowingly fraudulent, with Devolver's conduct removing any doubt. Devolver promoted these very Collaboration Products as its official merchandise: the official Hotline Miami website (hotlinemiami.com) advertised the "Erick Scarecrow x Dennaton collaboration" and directed customers to "Visit DEVOLVER DIGITAL for official merch," and Devolver's verified social media platform on YouTube channel featured ESC's collaboration figures in "Devolver Public Access Holiday Special 2023" to market its back catalogue (Hotline Miami, Enter the Gungeon, and others). A party that markets goods as its own official collaboration merchandise to sell its games cannot simultaneously hold a subjective good-faith belief that those goods are infringing "unlicensed derivatives." That Devolver used ESC's Collaboration Products to

promote itself on its own channels while procuring the removal of the same products from ESC's social media platforms X and Instagram accounts, which confirm the notices were not a good-faith effort to protect copyright but a means to appropriate ESC's goodwill and silence a competitor. The Honorable Judge Pitman's rejection of the underlying position of Counterdefendants, along with Tyz's March 12 refusal is conclusive evidence.

## COUNTERCLAIM V — BREACH OF WARRANTY AND INDEMNIFICATION
### (Against Devolver)

49.     Counterclaimants reallege and incorporate Paragraphs 1–48.

50.     Under Section 18 of the Agreement, Devolver warranted that: (a) Devolver has the authority to enter into the Agreement; (b) Devolver obtained "all clearances and consents required, for the exercise by ESC of the licenses granted hereunder, including, without limitation, all clearances and consents required from rights holders"; (c) the sale or use of Collaboration Products "will not violate or infringe the rights of any third party(ies)"; and (d) such use "will not require payment by ESC to any third party(ies)."

51.     Devolver breached its warranties with Counterclaimants: (a) Dennaton's Dennis Wedin had no knowledge of the ESC-Devolver agreements; thus, it appeared Devolver may not have obtained required clearances from the actual rights holder; (b) Devolver now claims ESC's sales infringes on Devolver's rights, which contradicts the warrant of such sales, and would not infringe; and (c) if Dennaton asserts claims against ESC, the warranty that sales would not require ESC to pay third parties is breached.

52.     Under Section 19, Devolver agreed to "indemnify, defend and hold ESC harmless from and against any and all third-party claims, judgments, damages and expenses (including without limitation, reasonable attorneys' fees) arising out of any breach or alleged

breach" of Devolver's warranties. Devolver's own lawsuit is the third-party claim that triggers this obligation. Devolver is suing ESC for doing exactly what Devolver warranted ESC to conduct in business agreement(s). Counterclaimants are entitled to full indemnification, coverage of all defense costs, damages, and reasonable outside attorneys' fees under Section 19.

## COUNTERCLAIM VI — TORTIOUS INTERFERENCE
### (Against Devolver, Tyz, and Downing)

53.    Counterclaimants reallege and incorporate Paragraphs 1–52.

54.    All Counterdefendants engaged in wrongful conduct, which was foreseeable to interfere between the PM Studios deal and ESC's relationships with social media platforms X and Instagram, customers, and potential third-party partners. The collateral harm to ESC business relationships is vastly disproportionate to potential business collaborations, and the interferences thereto.

## COUNTERCLAIM VII — ABUSE OF PROCESS
### (Against Devolver and Tyz)

55.    Counterclaimants reallege and incorporate Paragraphs 1–54.

56.    Devolver filed in the wrong venue purposely to interfere with ESC's business and potential abilities to attract client. Tyz filed serial DMCA takedowns to trigger repeat-infringer policies. A targeted preliminary injunction, not account destruction, was the proper avenue.

///

///

///

## COUNTERCLAIM VIII — BREACH OF IMPLIED COVENANT
### (Against Devolver)

57. Counterclaimants reallege and incorporate Paragraphs 1–56.

58. Nevada law implies a covenant of good faith and fair dealing in every contract. Where the terms of a contract are complied with, save one party deliberately contravenes the intention and spirit of the contract, and performing that contract unfaithfully to the contract's purpose, such that one party's justified expectations are denied, that unfaithful party is liable for breach of the implied covenant. The Agreement between ESC and Devolver is a valid contract. ESC performed its obligations, and was entitled to the benefits of the Agreement, including its Section 9 sell-off and reproduction rights, its Section 13 ownership of the Collaboration Products, the fifty-percent commission under Schedule 1, and Devolver's Section 5 obligation to market the Collaboration Products. Devolver deliberately contravened the spirit and purpose of the Agreement and denied ESC those justified expectations by: (a) acknowledging ESC's rights through its own authorized counsel and then reversing that position; (b) attempting to purchase ESC's rights, and when ESC declined to sell, Devolver retaliated by initiating litigation and a DMCA takedown campaign to destroy the business the Agreement created; (c) filing suit in an improper venue in derogation of the Agreement's Nevada forum-selection clause; (d) directing false DMCA takedown notices against ESC's authorized products; and (e) destroying ESC's internet and social media channels, of which the very channels Section 5 obligated Devolver to use said marketing platforms for the Collaboration Products, thereby sabotaging the commission revenue contemplated by Section 8. As a direct and proximate result, ESC has suffered damages in an amount to be proven at trial.

## COUNTERCLAIM IX — CIVIL CONSPIRACY
### (Against Devolver, Tyz, Downing, and Does 1–100)

59.      Counterclaimants reallege and incorporate Paragraphs 1–58.

60.      Under Nevada law, civil conspiracy requires: (1) two or more parties; (2) acting in concert; (3) intent to accomplish an unlawful objective to harm another; and (4) damages. Counterdefendants acted in concert to suppress ESC's business through false DMCA notices, by filing a retaliatory and purposely wrong venue litigation, and weaponization of correspondence in related said litigation. Tyz's conduct and ethics went beyond professional duties. Tyz's filing false sworn statements to third-party platforms was in its self, independent tortious conduct. Co-conspirators are jointly and severally liable for all damages, and those unknown at this time, will be identified as discovery takes place. The DMCA notices were not filings in any court, though it was sworn statements submitted to third-party social media platforms X and Meta, for the extra-judicial purpose of triggering automated repeat-infringer and violations, thus ESC being deplatformed on certain social media websites. Devolver's own Agreement obligated it to market the Collaboration Products via internet and social media (Section 5) and warranted that their sale would not infringe any third party's rights (Section 18(c)), no reasonable attorney could have sworn that those same products were infringing "unlicensed derivatives." Submitting knowingly false sworn statements to third parties to destroy a competitor's platform is independent tortious conduct undertaken in furtherance of the conspiracy, not protected advocacy.

61.      Discovery will reveal the identities of Does 1–100, including the extent to which, if any, Sony Interactive Entertainment directed, authorized, or ratified the campaign. Counterclaim Plaintiffs reserve the right to amend.

**COUNTERCLAIM X — DECEPTIVE TRADE PRACTICES (NRS 598.0915)**
**(Against Devolver, Tyz, and Downing)**

62. Counterclaimants reallege and incorporate Paragraphs 1–61.

63. Devolver, Tyz, and Downing made false representations of fact in DMCA notices, including false venue, false "unlicensed" characterization, and false ownership claims, solely for the purpose of removing ESC's content and suspending ESC's accounts on social media. These false representations were made in trade or commerce and caused ESC actual damages.

**COUNTERCLAIM XI — ACCOUNTING**
**(Against Devolver)**

64. Counterclaimants realleges and incorporate Paragraphs 1 through 63.

65. Devolver reproduced and sold Collaboration Products that ESC owns and was exclusively entitled to sell—including products offered through Devolver's own store at merch.devolverdigital.com, as well as at events, and figures Devolver advertised and sold "exclusively at the Devolver Digital Shop", and retained the monetary proceeds. Schedule 1 entitles ESC to a fifty-percent Commission on Collaboration Product sales, and Section 8 contemplates a quarterly reconciliation of accounts. The dates, volumes, and proceeds of Devolver's sales are peculiarly within Devolver's knowledge and not ESC's. ESC is entitled to a full accounting of all sales, revenues, and proceeds derived from the Collaboration Products and to payment of all Devolver's illicit gains.

///

///

**COUNTERCLAIM XI — ACCOUNTING**
**(Against Devolver)**

64.     Counterclaimants reallege and incorporate Paragraphs 1 through 63.

65.     Devolver reproduced and sold Collaboration Products that ESC owns and was exclusively entitled to sell—including products offered through Devolver's own store at merch.devolverdigital.com, as well as at events, and figures Devolver advertised and sold "exclusively at the Devolver Digital Shop"—and retained the proceeds. Schedule 1 entitles ESC to a fifty-percent Commission on Collaboration Product sales, and Section 8 contemplates a quarterly reconciliation of accounts. The dates, volumes, and proceeds of Devolver's sales are peculiarly within Devolver's knowledge and not ESC's. ESC is entitled to a full accounting of all sales, revenues, and proceeds derived from the Collaboration Products and to payment of all sums shown to be due.

**COUNTERCLAIM XII — CONVERSION**
**(Against Devolver)**

66.     Counterclaimants realleges and incorporate Paragraphs 1 through 65.

67.     ESC owns the Collaboration Products outright, with Section 13 providing that "ESC will retain legal ownership for all Collaboration Products", and holds the exclusive right to sell the products, all of which "shall survive the termination of this Agreement" under Section 9. Devolver exercised wrongful dominion over ESC's property by reproducing and selling Collaboration Products through its own store and retaining the identifiable proceeds and profits of those sales, in denial of and contradictory with ESC's ownership.

ESC is entitled to recover the value of the converted property and the proceeds Devolver retained.

## COUNTERCLAIM XIII — UNJUST ENRICHMENT (IN THE ALTERNATIVE)
### (Against Devolver)

68.     Counterclaimants realleges and incorporate Paragraphs 1 through 67.

69.     Pleaded in the alternative to ESC's contract claims: Devolver knowingly accepted and retained benefits conferred by ESC, including the proceeds of Collaboration Products that Devolver sold and the commercial value of ESC's original designs that Devolver used to market its games and storefront. For example, the "official merch" promotion at hotlinemiami.com and the use of ESC's figures in Devolver's promotional broadcasts. Retention of those benefits without payment has caused uncalculated damages. To the extent any use is found to fall outside an enforceable agreement, ESC is entitled to restitution of the value of the benefits conferred.

## COUNTERCLAIM XIV — DECLARATORY JUDGMENT OF NON-INFRINGEMENT
### (Against Devolver)

70.     Counterclaimants reallege and incorporate Paragraphs 1 through 69.

71.     An actual and justiciable controversy exists regarding whether ESC's products infringe any copyright or trademark right Devolver may hold. ESC's sale of Collaboration Products being authorized by Sections 9 and 13 and was acknowledged by Devolver's own prior counsel in the June 26, 2019 Sexton Letter, and ESC's original character designs and variants, are not limited to the SOAKED, DUSTED, and MMM works that ESC

independently authored and registered. ESC's authored work does not copy any protectable element owned by Devolver and do not infringe the asserted HOTLINE MIAMI common-law mark. ESC seeks a declaration under 28 U.S.C. § 2201 that these products do not infringe any copyright or trademark right of Devolver and that ESC's sale of Collaboration Products is authorized.

## COUNTERCLAIM XV — FALSE ADVERTISING (15 U.S.C. § 1125(a)(1)(B))
### (Against Devolver, Tyz, and Downing)

72.    Counterclaimants reallege and incorporate Paragraphs 1 through 71.

73.    In commercial communications disseminated to third-party platforms and, through the resulting takedowns and Devolver's public posture, to the relevant purchasing public, Devolver, Tyz, and Downing made false statements of fact about ESC's products. Counterdefendants representing that they are "unlicensed derivatives" and that ESC "falsely claims to be an 'Official Hotline Miami Collaborator," when in fact, ESC's products are authorized under the Agreement and acknowledged by Devolver's previous counsel. The statements were material, were made in connection with commercial activity in interstate commerce, and were foreseeably likely to deceive as to the nature and authorization of ESC's products, causing ESC lost sales, through deplatforming, and reputational injury. ESC is entitled to relief under 15 U.S.C. § 1125(a)(1)(B), including damages and, for the willful conduct alleged, enhanced damages and fees under 15 U.S.C. § 1117.

///

///

///

## COUNTERCLAIM XVI — BUSINESS DISPARAGEMENT / TRADE LIBEL
### (Against Devolver, Tyz, and Downing)

74.    Counterclaimants reallege and incorporate Paragraphs 1 through 73.

75.    Devolver, Tyz, and Downing published false and disparaging statements of fact concerning ESC's goods and business; which, included sworn statements to social media platforms X and Meta, characterizing ESC's authorized products as "unlicensed" and infringing, all the while knowing the statements were false or with reckless disregard for the truth, and intending to cause ESC pecuniary harm. Counterdefendants' statements caused ESC special damages, including the permanent deactivation of ESC's Instagram account, lost sales, and the collapse of pending business opportunities. ESC is entitled to recover its special damages.

## COUNTERCLAIM XVII — FRAUDULENT INDUCEMENT / NEGLIGENT MISREPRESENTATION
### (Against Devolver)

76.    Counterclaimants reallege and incorporate Paragraphs 1 through 75.

77.    In Section 18 of the Agreement, Devolver represented and warranted that the sale of the products would not violate or infringe the rights of any third party. The actual Hotline Miami intellectual property is owned by Dennaton Games (Dennis Wedin), who has stated that he "own[s] the IP fully" and did not know what agreement ESC had with Devolver, and the Honorable Judge Pitman noted that Wedin is the actual Hotline Miami IP owner. To the extent Devolver lacked the rights it warranted and made those representations knowing they were false or without a reasonable basis, intending ESC to rely on them in entering and performing the Agreement, ESC justifiably relied to its detriment and is entitled

to damages and, in the alternative, rescission. This count is pleaded with the particularity required by Federal Rule of Civil Procedure 9(b) to the extent applicable.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiffs pray for judgment:

A.      Compensatory damages not less than $30 million, plus additional damages for lost commissions, frozen pipeline, and reputational harm;

B.      Statutory damages under 17 U.S.C. §§ 501, 504(c)(2), and 512(f);

C.      Full indemnification under Section 19 of the Agreement, including all third-party claims, judgments, damages, and expenses (including reasonable attorneys' fees) arising from Devolver's breach of the Section 18 warranties;

D.      Attorney's fees, expert witness fees, court costs, and litigation expenses under the following independent bases:

(i) Section 19 of the Agreement (indemnification of all defense costs, damages, and reasonable outside attorneys' fees arising from Devolver's breach of the warranties in Section 18);

(ii) 17 U.S.C. § 512(f) (mandatory fees for DMCA misrepresentation);

(iii) 17 U.S.C. § 505 (copyright prevailing party fees);

(iv) NRS 41.600(3) (mandatory fees for deceptive trade practices);

(v) NRS 18.010(2)(b) (fees for claims brought without reasonable ground or to harass);

(vi) 28 U.S.C. § 1927 (personal liability of counsel for vexatious multiplication of proceedings);

(vii) Fed. R. Civ. P. 11(c) (sanctions for pleadings lacking evidentiary support); and

(viii) The inherent power of the Court to sanction bad faith litigation conduct,

E.     Declaratory judgment per Counterclaim II;

F.     Preliminary and permanent injunctive relief prohibiting further DMCA takedown notices and requiring withdrawal of all existing notices;

G.     Punitive damages for willful, malicious, and bad faith conduct;

H.     Damages, equitable relief, costs, and reasonable attorney's fees under NRS 41.600; An accounting of all sales, revenues, and proceeds derived from the Collaboration Products, and payment of all sums shown to be due (Counterclaim XI); Restitution and disgorgement of the benefits Devolver unjustly retained (Counterclaim XIII); A declaration under 28 U.S.C. § 2201 that ESC's Collaboration Products and original variants (including the SOAKED, DUSTED, and MMM works) do not infringe any copyright or trademark right of Devolver, and that ESC's sale of Collaboration Products is authorized (Counterclaim XIV); Damages, enhanced damages, and fees under 15 U.S.C. §§ 1125(a) and 1117 (Counterclaim XV);

M.     Prejudgment and post-judgment interest;

N.     Such other and further relief as this Court deems just and proper.

///

///

///

**DEMAND FOR JURY TRIAL**

Pursuant to FRCP 38(b), Counterclaim Plaintiffs demand a jury trial on all issues so triable.

Dated: June 23, 2026

Respectfully submitted,

**LEAH MARTIN LAW**

By: /s/ *Kevin Hejmanowski*
Leah A. Martin (NV Bar No. 7982)
Kevin Hejmanowski (NV Bar No. 10612)
Frank Sommers (Pro Hac Vice pending)
Paul J. Steiner (Pro Hac Vice)

Attorneys for Defendants/Counterclaimants
ESC-Toy, Ltd. and Erick Chatel

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of June, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

_____

An Employee of Leah Martin Law